```
            UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF WEST VIRGINIA
                     AT CHARLESTON
```

**LESLIE JOE NANCE,**

    Plaintiff

v.                                        Civil Action No. 2:02-0266

**KENTUCKY NATIONAL
INSURANCE COMPANY,**

    Defendant


### MEMORANDUM OPINION AND ORDER

This matter is before the court on defendant's motion for judgment as a matter of law or in the alternative for a new trial, filed December 5, 2005.

### I.

Plaintiff Leslie Joe Nance instituted this action seeking compensatory and punitive damages in the circuit court of Mingo County, West Virginia on or around January 7, 2002, against Kentucky National Insurance Company and former defendant Nationwide Insurance Company, alleging a cause of action for violations of the West Virginia Unfair Trade Practices Act, W.Va. Code § 33-11-1, et seq. by Kentucky National (Compl., Count II)

and by Nationwide Insurance (Count I).  Defendant removed the action to this court on March 22, 2002.  Nationwide Insurance was dismissed from this action by order dated October 13, 2004, after reaching a settlement agreement with plaintiff.

The trial began November 1, 2005.  At its conclusion, on November 7th, the jury awarded to the plaintiff the following amounts upon finding that defendant had violated the West Virginia Unfair Claims Settlement Practices Act, such as to constitute a general business practice:

```
        Increased costs and expenses  . . . . . . . .  $150,000
        Aggravation, inconvenience, and annoyance . . . 100,000
        Emotional Distress  . . . . . . . . . . . . . . 100,000
```

(Verdict Form ¶¶ 1 and 2.)  Thereafter, determining that defendant had acted with actual malice, the jury awarded plaintiff an additional $850,000 in punitive damages, for a total verdict of $1.2 million.  (Verdict Form ¶¶ 3 and 4.)  Judgment was entered in that amount on November 18, 2005.

At the conclusion of plaintiff's case, defendant had made a motion for judgment as a matter of law on the issues of attorney fees, costs, and wrongful litigation conduct.  The motion was denied.  The court understands defendant's December 5th motion to be a renewal of that motion as permitted by Fed R Civ P 50(b), at least with respect to those issues addressed by

defendant's motion at trial, and defendant alternatively seeks a new trial under Rule 59. Defendant asserts the following seven assignments of error:

1. The jury's verdict with respect to increased cost and expenses was unsupported by the evidence and reflects a clear misunderstanding and/or disregard for the evidence and/or the jury charge;

2. The West Virginia Unfair Claims Settlement Practices Act was inapplicable under the circumstances of this action;

3. There was no evidence of any wrongful litigation conduct sufficient to support the plaintiff's claims;

4. The recovery by the plaintiff of both punitive damages and emotional distress is duplicative recovery;

5. There was insufficient evidence that Kentucky National acted with actual malice, therefore, the jury should not have been permitted to award any punitive damages;

6. The jury's award of aggravation, annoyance and inconvenience was duplicative of its award for emotional distress; and,

7. The defendant was unduly prejudiced by the introduction of multiple expert witnesses with insufficient qualifications as well as multiple witnesses regarding the general business practice of the defendant.

(Def. Mot. at 1-2.)

II.

A jury verdict is "permitted to stand unless, under Rule 50(b), no substantial evidence is presented to support the award ... or, under Rule 59, the verdict is 'against the clear weight of the evidence, or is based upon evidence which is false, or will result in a miscarriage of justice.'" Stamathis v. Flying J, Inc., 389 F.3d 429, 436 (4th Cir. 2004) quoting Mattison v. Dallas Carrier Corp., 947 F.2d 95, 100 (4th Cir. 1991)(citations omitted).

The court may grant a motion for judgment as a matter of law during a jury trial after a party has been fully heard on an issue only if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed R Civ P 50(a). The moving party may renew its motion within ten days of the court's entry of judgment. Fed R Civ P 50(b). The court must examine the evidence in the light most favorable to the non-moving party and determine "whether a reasonable trier of fact could draw only one conclusion from the evidence." If so, the court may grant the motion. Brown v. CSX Transp., Inc., 18 F.3d 245, 248 (4th Cir. 1994) citing Townley v. Norfolk & W. Ry., 887 F.2d 498, 499 (4th Cir. 1989). But only where there is "no legally sufficient evidentiary basis for the

4

jury's verdict" may the court court do so. Prince v. City of Charlotte, 93 F.3d 1241, 1250 (4th Cir. 1990).

In contrast, when considering a motion for a new trial under Rule 59, a district court is permitted to weigh the evidence. Dennis v. Columbia Colleton Medical Center, Inc., 290 F.3d 639, 650 (4th Cir. 2002) citing Bristol Steel & Iron Works, Inc. v. Bethlehem Steel Corp., 41 F.3d 182, 186 (4th Cir. 1994). "The court should grant a new trial only if 1) the verdict is against the clear weight of the evidence, 2) is based on evidence which is false, or 3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." Dennis, 290 F.3d 639, 650 citing Knussman v. Maryland, 272 F.3d 625, 639 (4th Cir. 2001) (citations omitted).

### III.

A. <u>The Jury Award for Increased Costs and Expenses</u>

Defendant asserts that the only evidence offered by plaintiff with regard to increased costs and expenses was plaintiff's own testimony, that of his wife, Debra Nance, and that of attorney Todd Biddle, who represented plaintiff in the

5

underlying case. Each of these individuals, it argues, stated that litigation expenses for the underlying action were between $10,000 and $15,000. In response, plaintiff cites the following testimony of Biddle:

> Q. The fact that – during this time . . . is Mr. Nance incurring litigation expenses?
>
> A. Yeah. Early on, when I say early on in the case, up to 2002, he had incurred over 5,000, and then over the remainder of the underlying litigation, he incurred another 18, approximately 18,000.
>
> Q. Mr. Biddle, in October of 2002 when that trial occurred, did the continuance, did that cost Joe Nance money?
>
> A. Yeah, it cost a bunch of money. We went down there to Barbourville [Kentucky]. We had hotel rooms that we were staying at to be prepared for trial. We had two physicians . . . who were coming live to testify at trial. As a matter of fact, I think they were boarding a plane to fly down there when the continuance came through. That was another 10,000 dollars. When you get into these things, they get expensive.

(Trial Transcript, Testimony of Todd Biddle at 38.) Plaintiff acknowledges that the amounts to which Biddle testified total $33,000. He says that Biddle's testimony, together with that of plaintiff and Mrs. Nance, "and all reasonable inferences therefrom" could easily support a finding of $150,000 in increased litigation costs and expenses, especially given that

6

the matter was in litigation for four years. (Pl. Mem. at 5.)

But Biddle's testimony was clear and left little room for inference. He said that plaintiff initially incurred $5000 in expenses and another $18,000 "over the remainder of the underlying litigation." Thus, prior to the October 2002 trial date in Kentucky state court, plaintiff had amassed $23,000 in costs and expenses. Biddle then added another $10,000 for trial costs. It is not clear from his testimony whether the latter amount was spent only on expert witnesses or whether it included hotel costs, but it is certain that the amounts to which Biddle testified total only $33,000. Plaintiff and his wife also testified with regard to the underlying litigation, but Ms. Nance did not offer specific amounts of litigation expenses incurred, and plaintiff testified that his litigation expenses totaled about $15,000. He qualified, however, that these expenses covered witness fees and were for the trial date only.

The $150,000 award is clearly against the weight of the evidence. Though a reasonable jury could have concluded that plaintiff incurred $33,000 in increased costs and expenses as a result of defendant's bad faith practices, the evidence presented to the jury supports no more than that. The plaintiff, in a telephonic conference between the court and counsel for the

7

parties on March 27, 2006, has agreed to a remittitur of all but $33,000 of the $150,000 award for increased costs and expenses.[1] The United States Court of Appeals for the Fourth Circuit has explained this alternative:

> Remittitur, which is used in connection with Fed. R. Civ. P. 59(a), "is a process, dating back to 1822, by which the trial court orders a new trial unless the plaintiff accepts a reduction in an excessive jury award." Atlas Food, 99 F.3d at 593 (citation omitted). "[T]he permissibility of remittiturs is now settled." Id. (citations omitted). Therefore, if a reviewing court concludes that a verdict is excessive, "it is the court's duty to require a remittitur or order a new trial," id. (citing Linn v. United Plant Guard Workers, Local 114, 383 U.S. 53, 65-66, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966)), and the failure to do so constitutes an abuse of discretion, see Virginian Ry. Co., 166 F.2d at 408 (citations omitted).

Cline v. Wal-Mart Stores, Inc., 144 F.3d 294, 305 (4th Cir. 1998).

In view of the court's finding that the verdict is excessive with respect to increased costs and expenses beyond $33,000, coupled with plaintiff's agreement of remittitur, the verdict on this aspect of the case is limited to $33,000 rather than $150,000.

---

[1] Plaintiff had earlier stated that he would "accept a remittitur to decrease the jury award on this element . . . to $35,000[] as opposed to the granting of a new trial." (Pl. Resp. at 7.)

B.   **The Application of the West Virginia Unfair Claims Settlement Practices Act**

The jury was instructed without objection from the defendant.  In the course of instruction, the court informed the jurors about the following provision of the West Virginia Unfair Claim Settlement Practices Act:

> No [insurer] shall commit or perform with such frequency as to indicate a general business practice any of the following:
>
> (a)  Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies, [W.Va. Code § 33-11-4(9)(c)];
>
> (b)  Refusing to pay claims without conducting a reasonable investigation based upon all available information, [W.Va. Code § 33-11-4(9)(d)];
>
> (c)  Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear, [W.Va. Code § 33-11-4(9)(f)].[2]

Defendant now argues that because "the first notice of any claim . . . was the institution of the underlying action in Kentucky . . . there was no evidence presented of any claims adjusting activity within the [s]tate of West Virginia."  (Def.

---

[2]   The court notes that this section of the UTPA was presented by defendant in its fifteenth proposed instruction.

9

Mem. at 6.)  It cites W.Va. Code § 33-11-3: "No person shall engage in this State in any trade practice which is defined in this article as, or determined . . . to be an unfair method of competition or an unfair or deceptive act or practice in the business of insurance."

By order dated September 30, 2005, the court determined that West Virginia law applies to this action based on the significant relationship between this state and the dispute being litigated.  The court noted, <u>inter alia</u>, that defendant was licensed to do business in this state, and that plaintiff had purchased his policy of insurance from an independent agent in this state.  The court further noted that the parties had been asked to submit relevant information about the adjusting of plaintiff's claim, and defendant had submitted a supplemental affidavit conclusionally stating that, "The site of the claims adjusting was Kentucky," though it appeared that adjusters in at least the three states of Kentucky, New York, and New Jersey had worked on plaintiff's claim.  Upon the motion of plaintiff, the court ordered that portion of the submitted affidavit struck because it offered no support for his conclusional statement about the site of claims handling.

Defendant having enjoyed the benefits of conducting business in this state, wherein plaintiff, a resident of West Virginia, purchased the insurance policy issued by defendant from defendant's agent located in this state, the court has determined by its September 30, 2005, order that the Unfair Claims Settlement Practices Act applies to this action.  Moreover, nothing in W.Va. Code § 33-11-4 requires that an insurer establish a physical presence in West Virginia to be subject to its requirements.

### C. <u>Evidence of Wrongful Litigation Conduct</u>

Defendant argues that because its first notice of plaintiff's claim was the filing of the lawsuit, and because it cannot be held liable under the West Virginia Unfair Trade Practices Act for the independent actions of its attorneys, only evidence of wrongful litigation conduct on its part could support the jury's finding that it violated the UTPA.  It is true that, in West Virginia, the actions of the insurer's attorney exercising independent judgment are not subject to the UTPA.  <u>See</u> <u>Barefield v. DPIC</u>, 600 S.E.2d 256, 263 (W.Va. 2005).  It does not follow, however, that the insurer's hiring of an attorney absolves it of its own responsibilities under the Act, or

11

otherwise excuses inaction.  The West Virginia Supreme Court of Appeals has expressly rejected such a notion.  <u>Id.</u>

With respect to plaintiff's claims, expert witness Conrad Roger Diaz testified that liability likely would have been clear to a reasonably prudent adjuster upon reading the accident investigation report.  He said there was no indication of defendant's having conducted an investigation, and that this responsibility rested solely with the insurer, despite defendant's having hired a lawyer.  Though the underlying lawsuit was filed on November 22, 1999, an offer of settlement was not made until nearly three years later, on October 11, 2002, approximately two weeks prior to the first scheduled trial date of the underlying action.  The first offer was for $25,000, though Diaz estimated that damages at that time had reached approximately $115,000.  Plaintiff presented other witnesses, including lawyers Guy Bucci and Vince King, to establish that defendant engaged in a general business practice of unfair claims settlement.

Importantly, defendant presented only one witness, Martha Brown, the attorney who handled the underlying litigation on behalf of defendant.  Though she testified about actions taken by her in defense of the lawsuit, there was no evidence offered

12

to show what actions, if any, were taken by defendant upon receiving notice of plaintiff's claim.  There also were no apparent claims diary entries, as defendant had claimed application of the work product doctrine and the attorney-client privilege in this action with respect to that document and various correspondence between it and its attorney in the underlying action.

In short, while there was a great deal of evidence offered to show that defendant delayed the investigation and processing of its claims, and that it made unreasonable offers of settlement at late stages of the underlying litigation, there was no evidence put before the jury to show that defendant took any action to settle the claim of its insured for three years, when it offered $25,000 on a claim it ultimately agreed to settle for $60,000.

D.   Duplication of Damages

The court's instructions and the form of the verdict were read to the jury without objection from defendant.  The verdict form allowed the jury to award damages in three compensatory areas: increased costs and expenses; aggravation, inconvenience, and annoyance; and emotional distress.  Upon

13

finding actual malice, the jury could consider an award for a fourth category, punitive damages.  Defendant now argues that "plaintiff presented no substantial and concrete evidence of a serious, physical, emotional, or psychiatric injury" and the award for emotional distress is nothing more than punitive damages.  (Def. Mem. at 7.)  It further argues that plaintiff presented no evidence to distinguish his claims of emotional distress from his claims for aggravation, inconvenience, and annoyance.  (Def. Mem. at 9.)  This is the first time that either of these issues has been advanced by defendant, as it raised neither at trial.

        The West Virginia Supreme Court of Appeals has determined "that in the case of an intentional or reckless infliction of emotional distress claim, if there is not substantial and concrete evidence of a plaintiff's physical, emotional or psychiatric injury, some or all of an emotional distress damages award may actually be punitive damages."  Boyd v. Goffoli, 608 S.E.2d 169, 183 (W.Va. 2004) quoting Sheetz v. Bowles, Rice, McDavid, Graff & Love, 547 S.E.2d 256, 275 (W.Va. 2001).  In Sheetz, however, the court was careful to point out that the concept applied only where the awards were based on the torts of intentional or reckless infliction of emotional distress.  Here, where the awards were made for the plaintiff's

14

claims of UTPA violations, the "double recovery" concerns do not arise.

Moreover, there appears to be ample evidence to support an award for aggravation, inconvenience and annoyance and a separate award for emotional distress. Plaintiff testified that his experience in dealing with his insurance company was "always a fight." He was "bothered" that his insurance company was "blaming" him for the accident. He ultimately entered into a settlement in the underlying claim because his insurer "had finally beat [him] down." Certainly, this testimony evidences possible aggravation, annoyance, and inconvenience suffered as a result of defendant's having engaged in unfair claims settlement practices.

But plaintiff further testified to high levels of emotional distress brought on by the underlying litigation and by his precarious financial situation. He described his savings account as "exhausted" and testified that he was forced to obtain a loan against his home, though the mortgage had been paid off, and to sell a great deal of his personal property. He testified that his family physician began treating him for stress in either 2000 or 2001, and that he now takes medication for stress. The jury's verdict is supportable by this evidence.

E.   <u>Punitive Damages</u>

Punitive damages are available if a plaintiff shows that his insurer acted with actual malice.  The West Virginia Supreme Court has explained that actual malice means "that the company actually knew that the policyholder's claim was proper, but willfully, maliciously and intentionally utilized an unfair business practice in settling, or failing to settle, the insured's claim."  Syl. pt. 2, <u>McCormick v. Allstate Ins. Co.</u>, 505 S.E.2d 454 (W.Va. 1998).  Defendant asserts that there was no "clear and convincing evidence" that it acted with actual malice, and the testimony adduced at trial showed that "the litigation was handled as other litigation in Knox County, Kentucky."  (Def. Mem. at 7.)

As stated above, the evidence presented at trial showed little or no action by defendant with respect to plaintiff's claim for a very long time.  Though Diaz testified that liability was reasonably clear based on the accident report, nearly three years passed before any offer of settlement was made to plaintiff.  Additionally, through witnesses like King and Bucci, plaintiff showed that defendant had engaged in similar conduct as a general business practice, which may be evidence of intent.  <u>State Farm Mutual Ins. Co. V. Stephens</u>, 425 S.E.2d 577, 584

16

(W.Va. 1992). Under these circumstances, the jury's determination that defendant acted with actual malice is warranted.

F.  **Expert Witnesses**

Finally, defendant contends that it "was unduly prejudiced by the presentation of two . . . expert witnesses both essentially testifying to improper conduct by the defendant. Further, the defendant was unduly prejudiced by the presentation of multiple witnesses regarding the general business practices of the defendant." (Def. Mot. at 10.) It further states that the latter "testified about the general business practices of the defendant within the [s]tate of West Virginia and not within the [s]tate of Kentucky." (Def. Mot. at 10.) Defendant raised each of these points at the trial, and each was addressed in turn. For the reasons stated on the record, the court stands on its rulings with respect to those matters.

IV.

It is accordingly ORDERED that the defendant's motion for judgment as a matter of law with respect to the jury award to

17

plaintiff for increased litigation costs and expenses be, and it hereby is, granted insofar as the evidence does not support an award for $150,000 for that category of the verdict.  Plaintiff having agreed to remittitur, it is further ORDERED that damages for increased litigation costs and expenses be, and they hereby are, reduced to $33,000.  The jury award appearing to be supportable by the evidence in all other respects, it is further ORDERED that defendant's motion be, and it hereby is, otherwise denied.

The Clerk is directed to forward copies of this written opinion and order to counsel of record.

DATED: March 28, 2006

_____
John T. Copenhaver, Jr.
United States District Judge